**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ADOPTIVE FAMILY #1 AND THEIR** | : | |
| **DAUGHTER A.** | : | **CASE NO.:**  1:18-cv-179 |
| | : | |
| **And** | : | |
| | : | **JUDGE:** |
| **ADOPTIVE FAMILY #2 AND THEIR** | : | |
| **CHILDREN B. AND C.**[1] | : | |
| | : | **VERIFIED CLASS ACTION** |
| **Individually and on Behalf of Class of** | : | **COMPLAINT AND JURY DEMAND** |
| **Similarly Situated Children and Parents;** | : | |
| | : | |
| **c/o Gerhardstein & Branch Co. LPA** | : | |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, OH 45202** | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WARREN COUNTY, OHIO/WARREN** | : | |
| **COUNTY BOARD OF** | : | |
| **COMMISSIONERS** | : | |
| **406 Justice Drive** | : | |
| **Lebanon, Ohio 45036,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## I.    INTRODCUTION

1. This class action challenges the failure of Warren County to provide financial subsidies to the heroic families who adopt special needs children after serving them as foster parents.  Warren County's actions are wildly out of line with the rest of the state.  As of

---

[1] Plaintiffs seek to proceed under pseudonyms because of the sensitive nature of the case and to protect the privacy of their children.  A declaration stating their true names is available from Plaintiff counsel. A verified complaint signed with their true names is also available from Plaintiff counsel.

October 2017, approximately 40% of eligible adopting families were receiving no subsidy, and another 40% received $250 per month or less.

2. The primary goal of the Title IV-E adoption assistance program, established by the Adoption Assistance and Child Welfare Act, is to provide financial support to families who adopt difficult-to-place children from the public child welfare system. The Defendant's flagrant failure to provide the assistance due under this program hurts Warren County families. It significantly impairs foster children's chances of permanent adoption in the best suitable home, disincentivizes foster parents who are interested in permanently adopting their foster children, and strains families who have adopted children who are considered special needs under the statute.

3. These families choose to adopt their foster children because they want to give them the stability of a permanent home. They take these children in, often after they have already raised and supported biological children, despite the inevitable stress and pressure of adding persons to their household. They do this out of love. The Adoption Assistance and Child Welfare Act is supposed to make this easier on families and promote adoption by expanding the pool of potential adoptive families. They should not be punished for choosing to adopt these children over leaving them in perpetual foster care. This hurts the children and their new families and disrespects the permanent bond they have created.

4. Plaintiffs are suffering irreparable harm. They seek declaratory and injunctive relief against Defendant Warren County for violations of the Adoption Assistance and Child Welfare Act, and for violations of Plaintiffs' familial association and due process rights, given to them by the United States Constitution.

## II.     JURISDICTION

5.  This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6.  Venue is proper in this court pursuant to 28 U.S.C. § 1391.

7.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and is in accordance with Fed. R. Civ. P. 57 and 65.

## III.     PARTIES

8.  Plaintiff Adoptive Family #1 is comprised of Mother and Father 1, who are foster parents and the adoptive parents of a Title IV-E eligible, "special needs" child, living in or fostered out of Warren County, Ohio.

9.  Plaintiff A. is the Title IV-E eligible child of Family #1 and sues through her parents.

10. Plaintiff Adoptive Family #2 is comprised of Mother and Father 2, who are the adoptive parents of Title IV-E, "special needs" children, living in or adopted from Warren County, Ohio.

11. Plaintiffs B. and C. are the adoptive, Title IV-E eligible children of Family #2 and sue through their parents.

12. Defendant Warren County/Board of Warren County Commissioners is a unit of local government established under the laws of the State of Ohio. The County is sued through the Warren County Ohio Board of County Commissioners who are named only in their official capacity pursuant to O.R.C. § 305.12. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

## IV.     FACTS COMMON TO ALL CLAIMS

**A.  The Foster Care System**

13. Children in Warren County, and in the State of Ohio generally, who cannot safely

remain in their own homes, are placed in foster care, which is a temporary living situation.

14. Some children are placed with suitable relatives.  This is called kinship care.

15. Where kinship care is not an option, children are placed in a licensed foster care setting, including foster homes, residential group homes or treatment facilities, or independent living programs for 16 to 18-year-olds.

16. There are many requirements a person must meet before they can become a licensed foster parent, including pre-placement and continuing training and going through the home study process.

17. Foster parents receive subsidies from Warren County to help provide for the children in their care.  The amount is determined by the county.  This is a *per diem* amount, determined by the level of care the child requires.

18. When possible, these children are eventually returned to their homes.  Sometimes this is not possible.  When a court determines that returning home is not in a child's best interest, the court may grant permanent custody to the local agency, and the children can become legally available for adoption.

**19.** In some cases, foster children who become legally available for adoption are adopted by their foster parents.  If the child is not adopted, they stay in foster care until they "age out," at either age 18 or 21.

**B.  Statutory Scheme for Adoptions of Special Needs Children**

20. Title IV-E of the Social Security Act was enacted with the primary goal of providing financial support to families who adopt children with special needs, as designated by statute, so as to encourage permanent adoption and reduce the number of children

4

languishing in foster care.

21. Each state submits a plan for Title IV-E compliance as a condition of receiving federal funds.  In Ohio's plan, it "agrees to administer [its] programs in accordance with the provisions of this plan, title IV-E of the Act, and all applicable Federal regulations and other official issuances of the Department [of Health and Human Services]."  Ohio's Title IV-E State Plan can be found at http://jfs.ohio.gov/ocf/TitleIVEstateplan2015.stm.

22. Defendant, Warren County, is charged with issuing adoption assistance payments to eligible children under R.C. § 5101.141 and OAC 5101:2-49, in compliance with 45 C.F.R. § 1356 and 42 U.S.C. § 670, et seq., also known as Title IV-E of the Social Security Act.

23. Under 42 U.S.C. §673, the state "shall enter into adoption assistance agreements with the adoptive parents of children with special needs."  42 U.S.C. §673(a)(1)(A).  Under the agreement, the state "shall make" a nonrecurring payment for the expenses incurred in connection with the adoption of the child and where the child meets certain requirements, "may make adoption assistance payments."  42 U.S.C. §673(a)(1)(B). The "may" language here does not make monthly payments discretionary, but rather is a reflection of the fact that some children will be eligible for such payments while others are not.

24. Without the adoption subsidies from Title IV-E, there is a disincentive to adopt special needs children.  Foster parents, who are able to care for these special needs youth with the help of foster care maintenance payments, would lose that vital financial support if they choose to permanently adopt.  For many parents, that means that while they are willing, they are not able to create permanent homes for these children without

5

dramatically altering the family lifestyle. For the parents that choose to adopt anyway, it comes at the expense of their financial security and reduces opportunities for their children. The creation of adoption assistance was intended to remove this disincentive and allow and encourage more parents to create stable, long-term relationships that will benefit these children for the rest of their lives and get them out of a perpetual cycle of foster care.

25. 42 U.S.C. § 673(c) and OAC 5101:2-49-03 set the criteria for establishing that a child has "special needs" under Title IV-E, and thus entitling them to adoption assistance. These are children who are available for adoption and who meet one or more of the following criteria which makes it difficult to place the child for adoption:

a. the child is a part of a sibling group being adopted together, or is being placed in the same adoptive home as a sibling previously adopted;

b. the child is a member of a minority, racial or ethnic group making it difficult to place the child for adoption;

c. the child is six years old or older;

d. the child has been in permanent custody of Child Services for more than one year before adoptive placement;

e. the child has been in the prospective adoptive home for at least six months and would experience severe separation anxiety if removed from the home and placed in another setting;

f. the child has experienced a previous adoption disruption or three or more substitute care replacements while in the custody of Child Services;

g. the child has been diagnosed by a qualified professional as having a

6

developmental disability or delay, mental illness, or a medical condition causing

distress, pain, dysfunction, social problems or death; or

h. the child's biological family has a social or medical history establishing a

substantial risk for developing one of the above conditions.

26. A child is eligible for adoption assistance when he/she has a "special need," as defined

above, and either 1) "the State has determined that… a reasonable, but unsuccessful,

effort has been made to place the child with appropriate adoptive parents without

providing adoption assistance" or 2) "it would be against the best interests of the child

[to seek to place the child without assistance] because of… the existence of significant

emotional ties with prospective adoptive parents while in the care of the parents as a

foster child." 42 U.S.C. § 673(c)(1)(B); 42 U.S.C. § 673 (c)(2)(B)-(C).

27. "Once a child has been determined eligible under section 473 of the Act, adoptive

parents cannot be rejected for adoption assistance." U.S. Dep't of Health and Human

Servs., Federal Child Welfare Policy Manual, § 8.2A.2, ACYF-CB-PA-01-01 (1/23/01).

See 45 CFR 1356.40 (c).

28. The result is that children who have significant emotional ties with their prospective

adoptive parents as a result of the time they spent in foster care with them, and who have

"special needs" under the statute, cannot be denied adoption assistance.

29. For those who have not established significant emotional ties with their prospective

adoptive parents, a "reasonable, but unsuccessful, effort" can be made to place the child

without assistance. This is satisfied "by posing the question of whether the adoptive

parent(s) are willing to adopt without [assistance]. If the adoptive parent(s) state they

cannot adopt the child without [assistance], the requirement is met." OAC 5101:2-49-03

(A)(3)(a).

30. There is a duty to "actively seek ways to promote the adoption assistance program."  45
C.F.R. § 1356.40(f).  "This means that it is incumbent upon the State agency to notify
prospective adoptive parents about the availability of adoption assistance for the
adoption of a child with special needs."  U.S. Dep't of Health and Human Servs.,
Federal Child Welfare Policy Manual, § 8.2E, ACYF-CB-PA-01-01 (1/23/01).

31. The amount of adoption assistance should be negotiated between the families and the
agency, taking into account the "circumstances" of the family combined with the "needs
of the child."  42 U.S.C. § 673(a)(3).  It "shall provide for the special and anticipated
needs of the child projected over an extended period of time."  OAC 5101:2-49-05(B).

32. The adoptive family can only apply for adoption assistance after a child has been
matched with them.  OAC 5101:2-49-01(C).

33. This is necessary to allow the negotiation to take into account both the child's needs and
the family's circumstances.

34.  Although there is discretion in the exact amount agreed to by the family and the agency,
there are statutory guidelines.  The amount cannot exceed the foster care maintenance
payment that would have been paid had the child been in foster care at the time.  42
U.S.C. §673(a)(3).

35. "No income eligibility test shall be used when determining the monthly [adoption
assistance] amount."  The amount "should combine with the adoptive parent(s)
resources and circumstances of the adoptive family and shall provide for the special and
anticipated needs of the child."  OAC 5101:2-49-05(B).

36. "Consideration of the circumstances of the adopting parents… pertain[s] to the adopting

family's capacity to incorporate the child into their household in relation to their lifestyle, standard of living and future plans, as well as their overall capacity to meet the immediate and future needs (including educational) of the child. This means considering the overall ability of the family to incorporate an individual child into their household." This can include "life choices such as resigning one's job to stay at home with the adopted child or to return to school." U.S. Dep't of Health and Human Servs., Federal Child Welfare Policy Manual, § 8.2A.2, ACYF-CB-PA-01-01 (1/23/01). See 45 CFR 1356.40 (c).

37. "Unlike other public assistance programs in the Social Security Act, the title IV-E adoption assistance program is intended to encourage an action that will be a lifelong social benefit to certain children and not to meet short-term monetary needs during a crisis... The payment that is agreed upon should combine with the parents' resources to cover the ordinary and special needs of the child projected over an extended period of time and should cover anticipated needs, e.g., child care. Anticipation and discussion of these needs are part of the negotiation of the amount of the adoption assistance payment." U.S. Dep't of Health and Human Servs., Federal Child Welfare Policy Manual, § 8.2D.4, ACYF-CB-PA-01-01 (1/23/01). See 42 U.S.C. § 673(a)(3).

38. "Since there is no itemized list of approved expenditures for adoption assistance, the State cannot require an accounting for the expenditures. The amount of the assistance may be adjusted periodically if the family's or child's circumstances change, but only with the concurrence of the adoptive family." U.S. Dep't of Health and Human Servs., Federal Child Welfare Policy Manual, § 8.2D.1, ACYF-CB-PA-01-01 (1/23/01). See 42 U.S.C. § 673.

## C. Warren County's Systemic Failures to Provide Class Members Adoption Assistance Consistent with the Law

39. Defendant Warren County consistently fails to notify parents of the availability of adoption assistance while the children are in foster care.

40. Defendant Warren County consistently and intentionally lies to prospective adoptive parents about whether their child is entitled to adoption assistance, telling them in no uncertain terms that their child "does not qualify."

41. Defendant Warren County is not negotiating adoption assistance subsidies with adoptive parents before issuing a denial of benefits and reaching a determination of $0 subsidy.

42. Defendant has made statements to new foster parents that it will be requiring adoption assistance negotiations before permanent adoptive placement is made and before disclosure of the child's medical and family history has been provided.

43. This is contrary to the requirement that they match the child with a suitable family before negotiating adoption assistance and does not allow for the child's needs to be taken into account in determining the amount of adoption assistance. It indicates that Warren County is actively seeking adoptive parents who do not need adoption assistance before permanently placing children in homes for adoption and negotiating subsidies, which is in opposition to the best interests of the child and not allowed under the statute.

44. Defendant has claimed that it is required to issue a $0 subsidy under Ohio law when children have not "received a diagnosis." In doing so, Defendant is denying assistance to many eligible children.

45. Even when a child does have a medical diagnosis, Defendant regularly requires an overly detailed accounting of expenses to justify adoption assistance.

10

46.   The federal government and the State of Ohio pay the first $250 per month of all Title IV-E adoption assistance subsidies.

47.   Defendant has issued a subsidy at or below $250 to 78% of the 161 adoptive families with adoption assistance agreements with Warren County as of October, 2017 (126 out of 161 families receive a subsidy at or below $250) and has issued $0 subsidy for roughly 40% of the adoptive families (62 out of the 161 families are receiving $0).

48.   $250 per month is one of the most common amounts to be given as adoption assistance, second only to assistance of $0.  The next most common amount to be given as assistance is $240.  This suggests that Warren County is awarding amounts specifically because they will not require the county to contribute to the payments, rather than basing the number on the needs of the child and the circumstances of the family, as required by law.

49.   Other counties in Ohio have significantly higher rates of families receiving adoption assistance subsidies above $0 and often above the $250 per month federal floor.

50.   Defendant Warren County is known for retaliating against parents in a variety of situations, including when parents have retained legal counsel or were perceived as advocating too strongly for their children.

51.   Warren County's acts have prevented interested families from creating a permanent familial relationship with children who are available for adoption.

52.   Warren County's acts have harmed families who have chosen to create a permanent familial relationship with their children.

**D.  Facts Applicable to Adoptive Family #1**

53.   Mother and Father 1 have four grown biological children.  After their children moved

11

out, they considered fostering children. After praying about it, they decided it was right

for them.

54. They have fostered several children and adopted one, A.

55. Mother and Father 1 received A. as a foster care placement on May 16, 2013 when she

was nine years old. She is now fourteen and has been with them ever since.

56. A. has special needs because she was older than six years old when she became

available for adoption.

57. A. also has a social or medical history establishing a substantial risk for developing a

developmental disability, developmental delay, mental illness, or medical condition,

including repeated sexual abuse.

58. When she was young, prior to being taken out of her biological parent's custody, A.

experienced sexual abuse by multiple men.

59. She became legally available for adoption on September 29, 2014. At the time, they

were told by Defendant that she was "unadoptable," and that if they did not adopt her,

no one would. She had been in Family #1's home for more than six consecutive months.

Mother and Father 1 adopted her on August 18, 2015.

60. Mother and Father 1 had established strong emotional ties with A. while she was in

foster care. They love her and did not want her to be stuck in foster care indefinitely.

They wanted her to have the safety and security of a permanent home. Even though

they hadn't planned to adopt when they began fostering children, they knew adopting A.

was the right thing to do.

61. Before her adoption was finalized, Mother and Father 1asked about adoption assistance

but were flatly told that "she doesn't qualify."

62. When they were fostering A., they received $25-35 per day to help provide for her as a foster child.  This allowed Mother 1 to work part time, giving her more time to care for A.  She and her husband thought this was in A.'s best interest.  It also helped them cover the increased expenses of adding another person to the household, and activities for A.

63. When they adopted A. they lost their foster care subsidy and were awarded $0 adoption assistance.  Family #1 only acquiesced to an arrangement where their daughter received no adoption assistance because Defendant lied and misrepresented their child's eligibility to assistance.

64. Family #1 currently receives $0 in adoption assistance for A., despite her eligibility. If A. were still in foster care through Warren County today, she would receive a *per diem* amount totaling at least $700 per month, based on contemporary rates.

65. A is now a teenager, but she is still afraid to be home alone because of her history of abuse.  She is paranoid about checking locks on the doors and has had panic attacks when out with her family.  Mother and Father 1 want to help their daughter feel more secure and reduce her anxiety.

66. Mother and Father 1 love their daughter.  She is social and loves school.

67. Mother and Father 1 want to send A. to a private, all-girls high school because they think she would do better in that environment, due to her history of abuse, but private school is expensive, and they doubt they will be able to afford it.

68. This year, A. participated in sports at school, but they were not able to afford competitive swimming team because it was too expensive.  They want to get her back in more activities, including swim team, because it helps with her self-image and self-confidence.  She has recently been diagnosed with depression, which will mean therapy

13

and medication for A. They think being back on the swim team will help with her depression as well.

69. Adoption assistance would also help with the more everyday expenses, like groceries, school fees and clothes, church clothes, and sports equipment. They want to be able to purchase spirit wear for her but haven't been able to do so. She will also need braces soon.

70. A. attends church camp in the summer, and now she is old enough to go on the church's mission trips. They want to be able to send her but aren't sure if they will be able to afford to do so without assistance.

71. Finally, adoption assistance would help them be financially stable enough to save for the future. They want to save for college, and eventually for a wedding for their daughter, but it's hard. As their third daughter, A. will be their third wedding to pay for, and she will be their fifth child to support through college. Adoption assistance would allow them to do so.

72. Mother and Father 1 believe based on their own experiences that retaliation is common by Defendant Warren County.

73. Mother and Father 1have chosen not to adopt again. They have fostered more children, but not through Warren County, because county staff have lied to the family. They feel Defendant cannot be trusted.

**E.  Facts Applicable to Adoptive Family #2**

74. Mother and Father 2 were unable to have biological children, and decided they wanted to foster children, with eventual adoption as their goal, if appropriate for the child. They

wanted to have children and thought this would be the best way because then they would be able to give back to society.

75. They fostered a few children, but none of them became available for adoption.

76. They had stated a preference for children under the age of two, because of the difficulties of fostering and adopting older children, but when Warren County called them about fostering two brothers, one aged six months, and the other five years, they agreed.

77. They were hesitant, because they knew it would impact the rest of their lives, but they decided it was the right thing to do.

78. Mother and Father 2 received B. and C. as foster care placements on September 26, 2013, when they were five years old and six months old.  They are now ten years old and five years old and have been with them ever since.

79. When they received B., he could not count to ten, did not know the alphabet, and had severe behavioral and social issues.

80. B. has special needs.  He has been diagnosed with ADHD.  A qualified professional has provided written statements supporting their assessment and evaluation.

81. He is on medication and in therapy.

82. B. also has other problems.  He struggles with interpersonal relationships and is struggling in school.

83. When they received C., he had a flat head due to neglect, and was sick constantly.

84. Since then, his health has improved.  He is well-adjusted and very mature for his age.

85. B. and C. both have special needs because they were adopted together as a sibling group.

86. B. and C. also both have a social or medical history establishing a substantial risk for developing a developmental disability, developmental delay, mental illness, or medical condition, including a family medical history of depression, bipolar disorder, dementia, and drug and alcohol use and a family social history including time in jail. Additionally, C. was born premature and spent several weeks in the hospital when he was born.

87. They became legally available for adoption in June 2015. Mother and Father 2 adopted both boys on April 7, 2016.

88. Mother and Father 2 had established strong emotional ties with B. and C. while they were in foster care. They love their boys and wanted to give them a better life.

89. Before the adoption was finalized, Mother and Father 2 asked about adoption assistance. They were flatly told that C. does not qualify because he did not have a diagnosis.

90. Warren County refused to give them any assistance for C.

91. They were told that B. qualified but getting Warren County to agree to assistance was still difficult. They were able to get $250 a month for B., based on his diagnosis, but they were limited to that number because it was the highest they could receive without Defendant having to contribute financially. Defendant refused to consider an amount based on the family's circumstances and B.'s needs. The number they arrived at was based solely on Defendant's desire not to contribute any county resources.

92. When they were fostering the boys, they received $13 per day for each child to help provide for them and they received free daycare. If B. and C. were still in foster care

through Warren County today, they would each receive a *per diem* amount totaling at least $700 per month, based on contemporary rates.

93. Family #2 currently receives $0 in adoption assistance for C., despite his eligibility. Family #2 currently receives $250 in adoption assistance for B., but this amount did not take the family's circumstances or B.'s needs into account.

94. Family #2 only acquiesced to this arrangement because Defendant lied and misrepresented their child's eligibility to assistance.

95. Adoption assistance would help them pay for B.'s therapy, and for karate for the boys. B. has responded well to the structure of his karate class, and his parents think it can help him behaviorally and socially.  Adoption assistance would also help them create new memories for their sons.  They want to be able to help them make new memories to replace the bad ones, including taking them on vacation or to Disney World, but giving the boys new experiences costs money.  They would also like to be able to put B. in tutoring, and to save for the future, including the boys' college educations.  It would also help with the more mundane costs, like paying to replace things that B. breaks.

96. Mother and Father 2 love their boys.

97. Mother and Father 2 believe based on their own experiences that retaliation is common by Defendant Warren County and if they don't like you, they will "punish" you.

### V.    CLASS ACTION ALLEGATIONS

98. Plaintiffs bring this case on behalf of themselves and as a class action under Fed. R. Civ. P. 23(b)(2) on behalf of all members of the class.

99. The class, represented by Plaintiffs, is defined as: all current and potential adoptive

17

parents, and their adopted children, who are eligible to receive subsidies under Title IV-E of the Adoption Assistance and Child Welfare Act and fall under the jurisdiction of Warren County Children Services.  There are two sub-classes: those who are receiving between $0 and $250 in adoption assistance subsidies, and those who are receiving more than $250 in adoption assistance subsidies.

100.    All members of the class were and are similarly harmed by the Defendant's actions.

## A. Numerosity

101.    There are 160 former foster children, who are eligible for Title IV-E subsidies, that have been adopted by families in Warren County, 126 of which receive a subsidy of or below $250, and 62 that receive $0.  It is apparent that the number of class members is so large as to make joinder impracticable. Class members may be notified by individual mail, email, general posting on appropriate websites and other means as appropriate.

## B. Common Questions of Law and Fact Predominate

102.    There are numerous questions of law and fact common to Plaintiff and class members that predominate over questions affecting only individual members, including but not limited to:

   i.   Warren County Children Services adoption assistance policies,

   j.   Warren County Children Services  implementation and execution of their obligations under 42 U.S.C. §673,

   k.   Warren County Children Services  use of a means test to refuse adoption assistance,

l. Warren County Children Services requirement of a "diagnosis" to receive adoption assistance,

m. Children's eligibility for adoption assistance under state and federal law,

n. And the statutory definition of "special needs."

**C. Typicality**

103. The claims asserted by Plaintiffs in this action are typical of the claims of the class members, as the claims arise from the same course of conduct by Defendant, and the relief sought is common to the class members. Further, there are no defenses that are available to Defendant that are unique to Plaintiffs.

**D. Adequacy**

104. Plaintiffs will fairly and adequately represent and protect the interests of the class. Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class members they seek to represent, and they have retained competent counsel. Plaintiffs and Plaintiff's counsel will fairly and adequately protect class members' interests.

**E. Injunctive and Declaratory Relief are Appropriate Because Defendant's Actions Apply Generally to the Class as a Whole**

105. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant has acted and refused to act on ground generally applicable to class members, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each class member.

**VI. FIRST CAUSE OF ACTION – § 1983 – ADOPTION ASSISTANCE AND CHILD WELFARE ACT**

106.     Plaintiff children, A., B., and C., became legally available for adoption and were eligible for Title IV-E adoption assistance subsidies because there were determined to have "special needs" by the State of Ohio.

107.     It was against the best interests of Plaintiff children, A., B., and C., to place them without adoption assistance because of the existence of significant emotional ties with their prospective adoptive parents, developed during their time as foster children. Despite their entitlement to adoption assistance, at the time of their respective adoptions, Defendant denied Plaintiffs A. and C. any subsidy.

108.     Despite his entitlement to adoption assistance based on his needs and the circumstances of his family, Plaintiff B. is receiving only $250 in subsidies from Defendant, much less than they received when he was in foster care.

109.     Defendant, acting under color of law, violated Plaintiffs' rights under 42 U.S.C. §673 when it denied adoption assistance to entitled children and obstructed access to such assistance to the plaintiffs and the class they represent.

110.     These claims are actionable under §1983.

## VII.     SECOND CAUSE OF ACTION – § 1983 – UNITED STATES CONSTITUTION

111.     Defendants, acting under color of law, have violated rights secured to the plaintiffs and the class they represent by the First and Fourteenth Amendment to the United States Constitution, including the right of familial association, and the right to due process of law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.  Certify this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil

Procedure;

B.  Enter a declaratory judgment that Defendants' denial of adoption assistance to Plaintiffs is in violation of Title IV-E of the Adoption Assistance and Child Welfare Act, 42 U.S.C. §673;

C.  Enter a declaratory judgment that Defendants' denial of adoption assistance to Plaintiffs infringes of their fundamental rights in violation of the First and Fourteenth Amendment's right to familial association and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D.  Preliminarily and permanently enjoin Defendants, their agents, representatives, and employees, from continuing its practice of denying adoption assistance to eligible families and order Defendants to make such assistance available to Plaintiffs;

E.  Require Defendants to comply with the mandates of the Title IV-E Adoption Assistance Program and the First and Fourteenth Amendment to the United States Constitution;

F.  Award all costs and expenses of this action;

G.  Award reasonable attorney's fees, pursuant to 42 U.S.C. § 1988(b); and

Award any such further legal and equitable relief that this Court may deem just and proper.


Respectfully Submitted,


Barbara Thornell Ginn (0083197)
Ginn Law Office, LLC
Attorney for Plaintiff
8595 Beechmont Avenue,
Suite 103
Cincinnati, Ohio 45255
Tel (513) 277-1478
Fax (513) 426-7335
Barbara@GinnLLC.com

/s/ Alphonse A. Gerhardstein
Alphonse A. Gerhardstein (0032053)
Attorney for Plaintiff
Jennifer L. Branch (0038893)
M. Caroline Hyatt (0093323)
Attorney for Plaintiff
Gerhardstein & Branch Co. LPA
441 Vine St., Suite 3400
Cincinnati, Ohio 45202
Tel (513) 621-9100

21

Fax (513) 345-5543
agerhardstein@gbfirm.com
jbranch@gbfirm.com
chyatt@gbfirm.com

Verification:

The undersigned plaintiffs, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that

the facts alleged in this complaint are true and correct:

_Family 1_     3/12/18
Family 1

_____
Family 2

Verification:

The undersigned plaintiffs, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the facts alleged in this complaint are true and correct:

_____
Family 1

Family #2
_____
Family 2