# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ADOPTIVE FAMILY #1 AND THEIR
DAUGHTER A, et al.,
    Plaintiffs,

vs.

WARREN COUNTY, OHIO/WARREN
COUNTY BOARD OF
COMMISSIONERS,
    Defendant.

Case No. 1:18-cv-179
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

This matter is before the Court on plaintiffs' motion to certify class (Doc. 3), notice of filing expert reports (Doc. 13), supplemental memoranda in support of motion to certify class (Docs. 32, 41), defendant Warren County Board of Commissioners (Warren County)'s responses in opposition to plaintiffs' motion and supplements thereto (Docs. 48, 77), plaintiffs' reply memorandum (Doc. 82), and the parties' post-class certification hearing memoranda (Docs. 104, 105).

## I. Background

Title IV-E of the Social Security Act, 42 U.S.C. § 670 et seq., governs adoption assistance subsidies for adoptive parents. To receive federal funding under Title IV-E, states must develop a plan for adoption assistance and obtain approval of that plan from the United States Secretary of Health and Human Services. 42 U.S.C. § 671. A state with an approved plan "shall enter into adoption assistance agreements . . . with the adoptive parents of children with special needs." 42 U.S.C. § 673(a)(1)(A). A child with special needs is one who is available for adoption and who meets certain criteria that have traditionally made children less likely to be adopted. These criteria include, among others: the child is a part of a sibling group being adopted together, or is being placed in the same adoptive home as a sibling previously adopted;

the child is a member of a minority, racial or ethnic group making it difficult to place the child for adoption; the child is six years old or older; or the child has been in the prospective adoptive home for at least six months and would experience severe separation anxiety if removed from the home and placed in another setting. *See* 42 U.S.C. § 673(c); Ohio Admin. Code 5101:2-49-03.

Adoption assistance payments are governed by § 673(a)(1)(B), which provides:

Under any adoption assistance agreement entered into by a State with parents who adopt a child with special needs, the State - -

(i) shall make payments of nonrecurring adoption expenses incurred by or on behalf of such parents in connection with the adoption of such child, directly through the State agency or through another public or nonprofit private agency, in amounts determined under paragraph (3), and

(ii) in any case where the child meets the requirements of paragraph (2), may make adoption assistance payments to such parents, directly through the State agency or through another public or nonprofit private agency, in amounts so determined.

42 U.S.C. § 673(a)(1)(B). Adoption assistance payments:

shall be determined through agreement between the adoptive parents and the State . . ., which shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents . . ., depending upon changes in such circumstances. . . .

42 U.S.C. § 673(a)(3).

Ohio has an approved state plan for adoption assistance and has agreed to be bound by all of the federal requirements under Title IV-E. Defendant Warren County administers adoption assistance subsidies through its public children services agency, Warren County Children Services. *See* Ohio Admin. Code 5101:2-49-01. Warren County Children Services determines the initial and continuing eligibility for adoption assistance subsidies. *Id.*

Plaintiffs Adoptive Families #1, #2, and #3 are families who have adopted children with special needs after serving them as foster parents. They seek to represent a class of all current and potential adoptive parents, and their adopted children, who are eligible to receive subsidies under Title IV-E of the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 670, et seq., and who fall under the jurisdiction of Warren County Children Services. Plaintiffs allege that Warren County denies eligible children adoption assistance to which they are entitled and obstructs families' access to such assistance in violation of the United State Constitution and Title IV-E. Plaintiffs seek declaratory and injunctive relief against Warren County for these alleged violations.

Adoptive Mother and Father #1 adopted their daughter (Child A) after serving as foster parents for her. Their child has special needs because she was more than six years old when she became available for adoption. She also has a social or medical history which includes repeated sexual abuse and that establishes a substantial risk of developing a developmental disability, developmental delay, mental illness, or medical condition. Before the adoption was finalized, Mother and Father #1 asked about adoption assistance. Adoptive Mother testified they were told that "we do not qualify for help" because their foster daughter was not receiving treatment for physical handicaps or psychological issues and did not fit the criteria listed on the paper they reviewed with the caseworker. (Doc. 103 at 30, 38). When they were fostering Child A, Mother and Father #1 received approximately $1,000.00 per month to help provide for her as a foster child. When they adopted Child A, Mother and Father #1 lost their foster care subsidy and were awarded $0 adoption assistance. Mother #1 testified she adjusted her work schedule to part-time to spend more time with Child A. She testified she was not advised by the adoption caseworker that the adoption subsidy could be used to partially offset the lost income she

3

experienced to support and care for her adopted daughter. At the time Child A was adopted, she attended public school and was going to begin fifth grade. In view of her history of sexual abuse and entry into Middle School, Mother and Father #1 wished to send Child A to a private Christian school. They discussed their desire with the adoption caseworker, who did not advise them that an adoption subsidy could be used to partially offset tuition under the circumstances. Child A was placed back in public school and experienced sexual taunting and struggles with depression. Mother #1 testified they did not seek any tuition subsidy at this time because while they were told they had the right to renegotiate an adoption subsidy at any time, they were told Child A would need to be placed into a home for disturbed children to receive a subsidy and Mother #1 did not feel they fell into that category. (*Id.* at 34). She admitted that she signed a worksheet before the adoption was finalized that indicated she could adopt Child A without a subsidy. She signed an adoption assistance agreement to accept a subsidy of "zero" but only after they were told they were not eligible for an adoption subsidy. (Doc. 96, Def. Ex. A).

Subsequent to the filing of this lawsuit, Mother #1[1] renegotiated for the full adoption subsidy of $1,045. She testified that if the maximum rate increases, she would like to have the opportunity to renegotiate the adoption subsidy in the future should her needs exceed the current maximum rate. She also testified that she would like the opportunity to secure the right to receive back benefits she lost before adoption assistance was awarded.

Mother and Father of Adoptive Family #2 adopted Children B and C together as a sibling group in April 2016. They had previously served as foster parents for B and C and received free daycare and $13 per day for each child to help provide for them. (Doc. 84 at 24). Prior to his diagnosis of ADHD, Warren County offered a zero adoption subsidy to Child B. (Doc. 84 at 32,

---

[1] Father #1 died following the filing of the lawsuit.

4

116). However, after Child B was diagnosed with ADHD, he received an adoption subsidy of $250. (Doc. 84 at 36-37). Child C did not have a diagnosis and received a subsidy of zero. Adoptive Family #2 was advised that Child C did not qualify for a subsidy without a diagnosis (Doc. 84 at 41-42), but Child B qualified based on his diagnosis (Doc. 84 at 44). Adoptive Family #2 was also advised by a Warren County caseworker that daycare is not part of the subsidy process and because they were adopting the children, it now became their responsibility. (Doc. 84 at 47, 111-112; Doc. 84-5 at 3; Doc. 96 at 17). They were denied a subsidy related to time off from work for appointments for the children as that "is a responsibility of being a parent." (Doc. 84-5 at 3; Doc. 96 at 17). Adoptive Family #2 was further advised "that subsidy negotiation at this point is based on the child(ren)'s current needs and does not include anticipated and future needs as discussed before." (*Id.* at 1). Adoptive Family #2 acquiesced to this arrangement only because defendant had misrepresented their child's eligibility for assistance.

In 2018, Adoptive Family #2 requested renegotiation of their adoption assistance agreement. (Doc. 84 at 52). Adoptive Family #2 receives a $350 adoption subsidy per month for Child C and a $450 adoption subsidy for Child B. (*Id.* at 93-94). They are not currently pursuing any renegotiation of the amount that they are currently receiving for Child B or Child C. (*Id.* at 103).

In May 2012, Adoptive Family #3 adopted Child D and Child E, a sibling group which had been in the home of their prospective adoptive parents for more than six months. Mother and Father of Adoptive Family #3 were foster parents for the children prior to their adoption and received $720 per month in foster care assistance. When they met with a Warren County caseworker to negotiate an adoption subsidy, the caseworker advised them that the policy had

changed. Warren County would now offer zero dollars in an adoption subsidy unless Adoptive Family #3 could substantiate their claim for a subsidy by providing a doctor's note or diagnosis. (Doc. 87 at 24-25, 27). Adoptive Father #3 initially asked for $250 for each child for daycare, tutoring, and sports for the children. He did not provide documentation to justify that amount. He testified that he was told by the caseworker that he was responsible for daycare and he should go to a doctor to get a diagnosis. (Doc. 87 at 32-34, 38, 41-42, 110). One child who had a diagnosis received a subsidy of $180 per month; the other child who did not have a diagnosis received a subsidy of $0. (Doc. 87-5 at 2; Doc. 87-6 at 2). Agency documents indicate that Adoptive Family #3 "and the agency signed an agreement that [Child] will continue to receive a medical card through this program, but will not receive a monthly subsidy right now since [Child] doesn't currently have any atypical needs." (Doc. 88-5).[2]

In 2017, Adoptive Family #3 sought to renegotiate its current subsidy. (Doc. 87 at 85, Ex. EE). They were asked by Warren County for "documentation of any new needs . . . documented by reports or assessments completed by qualified professionals" and "documentation from providers or your insurance company to show the anticipated out of pocket per month cost of the services or special care to address these needs. . . ." (Doc. 96 at 15). Adoptive Father #3 testified he understood this to mean they were required to provide a clinical diagnosis of the children to support their request to renegotiate the adoption subsidy. (Doc. 87 at 93). Adoptive Family #3 did not have documentation from a pediatrician or psychologist that they understood was required, did not provide documentation in response to Warren County's request believing it would be fruitless to continue the process, and did not renegotiate the adoption subsidy for their children. Adoptive Father #3 testified that the County's policy had not

---

[2] Melissa Pittman, a caseworker with Warren County Children's Services, testified this was not an accurate statement of the types of expenses that are compensable as part of the adoption subsidy. (Doc. 88 at 62).

changed from the time of the original negotiation and they "would be in the same position." (Doc. 87 at 96, 104). Warren County sent Adoptive Family #3 a letter indicating it would continue the subsidy in the same amount as set previously. (Doc. 87 at 98-101, Ex. HH). The letter advised Adoptive Family #3 that it could contact the agency to discuss the matter further and start the renegotiation process by contacting the agency. (*Id*.). The letter also advised the family of its state hearing rights. (*Id*.). Adoptive Family #3 did not request to renegotiate the adoption subsidy subsequent to this period. (Doc. 87 at 103).

Adoptive Family #4 has two adoptive children, Child 4-A and Child 4-B. (Doc. 29-2 at 2). Adoptive Family #4 received Child 4-A as a foster child when she was six months old in September 2013. (*Id*.; Doc. 100 at 97). Her biological family history includes mental illness. (Doc. 29-2 at 2). Child 4-A was adopted by Adoptive Family #4 two years later and had lived with Adoptive Family #4 for this entire time period. Child 4-A had developed a strong emotional attachment to and bond with her prospective adoptive family prior to her adoption. (Doc. 100 at 97-99). When Adoptive Family #4 was adopting Child 4-A, the adoption caseworker told them Child 4-A did not qualify for an adoption subsidy because she did not have a diagnosis at the time. (Doc. 29-2 at 2; Doc. 100 at 33, 43, 49). Adoptive Family #4 relied on and accepted this representation as accurate and agreed to accept a zero adoption subsidy. (Doc. 29-2 at 3; Doc. 100 at 43-44). Adoptive Father #4 stated he signed the adoption assistance agreement accepting a zero subsidy because he was under the impression his daughter was not eligible for an adoption subsidy and testified, "I felt I was educated by my caseworker and was signing that to support her, what she told us." (Doc. 100 at 49). Although Child 4-A exhibited behavioral concerns prior to her adoption, she did not receive an adoption subsidy until she received a diagnosis. (Doc. 100 at 49-51). When asked if he and his wife had considered

whether to ask for adoption assistance unrelated to medical expenses, Adoptive Father #4 testified that he realized medical expenses above what Medicaid would cover would become an issue, but "we had no real knowledge of how the subsidy even worked" and after speaking with the caseworker believed they could request assistance once those expenses occurred. (Doc. 100 at 52). He testified that at that time, those circumstances had not yet come to pass and he was not thinking about other expenses they might incur for which they could request adoption assistance. (Doc. 100 at 53). When Child 4-A was older, she was formally diagnosed with behavioral and sensorial disorders, among other things, and Adoptive Family #4 asked to renegotiate the adoption subsidy. (Doc. 29-2 at 3). One and one-half years after requesting the renegotiation, with the assistance of counsel and after filing for two state hearings, Adoptive Family #4 reached an agreement with Warren County for a $450 per month adoption subsidy. (*Id.* at 4).

Adoptive Mother and Father #5 were foster parents prior to adopting their son. During the initial negotiation process, Adoptive Family #5 was told by their Warren County caseworker that their adoptive child would not qualify for any subsidy because he had no conditions that Medicaid would not cover. (Doc. 91 at 73). Adoptive Family #5 ultimately received $150 in an adoption subsidy, which Adoptive Family #5 understood covered mileage to and from speech therapy and an over-the-counter lotion their adoptive son needed.

Adoptive Family #5 sought to renegotiate its adoption subsidy in 2017. Warren County caseworkers advised them that "[i]f the child qualifies for an adoption subsidy due to special needs, it is meant to provide financial assistance based on that child's special needs." (Doc. 88-4; Doc. 96 at 14). A biological child of Adoptive Family #5 experienced a severe illness which resulted in changes in the family's circumstances. (Doc. 91 at 66-67). The agency's reply

focused only on the adopted child's special needs: "While the agency is sympathetic to the circumstances surrounding your biological child's illness, at this point, the agency has not received any documentation verifying the other actual additional expenses that form the basis of the claim that $150 per month is no longer sufficient to subsidize the expenses relating to [Adopted Child's] special needs." (Doc. 91-11 at 2). Adoptive Family #5 was advised that "changes of family circumstances . . . and increased cost of daycare as a result of adopting . . . should have been considered prior to making the decision to adopt." (Doc. 96 at 14).

Adoptive Family #6 adopted two children in January 2017. Adoptive Father #6 testified that at the first meeting for adoption assistance, he was advised by his caseworker that his children qualified for adoption assistance because of their special needs and that the subsidy was for special medical needs and therapy. (Doc. 101 at 31). Adoptive Family #6 was advised by email that they could not receive assistance for pre-school. (Doc. 101, Ex. D-4; Doc. 96 at 12). They received adoption assistance subsidies in the amount of $50 and $150 per month for the children. (Doc. 101 at 62). They have not requested a renegotiation of the adoption assistance subsidy amounts. (Doc. 101 at 36-37, 40).

Dr. Brian Calfano, an expert in political science and the use of statistical methodology, analyzed a data set provided by the Ohio Department of Job and Family Services, which collects data on adoption subsidies for the 88 counties in Ohio. He testified that the mean (average) adoption subsidy for Warren County was $176, while the mean subsidy for the State of Ohio was $526. Dr. Calfano opined that the mean adoption subsidy from Warren County is statistically different from the average or baseline level of subsidies offered across Ohio and in comparison to Warren County's closest geographic neighbors. Dr. Calfano opined that the difference was statistically significant, meaning that the difference in Warren County's subsidy average is large

9

enough to be considered the result of systematic effects from policy decisions on subsidy rates and not because of randomness or simply chance. Dr. Calfano also examined zero subsidy cases across Ohio and concluded that the percentage of Warren County's zero subsidy cases "is the *only one* that is statistically different from the state percentage among its group of neighboring counties." (Doc. 13-3 at 9) (emphasis in the original). Dr. Calfano concluded that "the consistency of these findings showing significantly lower subsidy amounts for Warren County across a relatively sizable number of subsidy cases since 2005 (relative to Warren's fifteen neighboring counties) suggests it is the systematic effects of policy decisions that make Warren County's subsidies statistically different (i.e., the lowest in Ohio)." (*Id*. at 11-12). Dr. Calfano testified that given this statistical information, the next step in explaining the systematic extremes in the low Warren County subsidies would be to examine the actual policies applied by the County and by examining the actual cases that make up the data set. Dr. Calfano admitted he could not identify the factual basis for any zero subsidy case, including whether a family received a zero subsidy because they moved from out of state and were not eligible for an Ohio adoption subsidy or because a family simply declined an adoption subsidy. Dr. Calfano testified that the regression analysis he performed is a tool for identifying patterns or extreme cases in a data set, and based on his analysis he found that Warren County adoption subsidy cases presented an extreme case. He reiterated that given such findings, the next step would be to examine the actual facts of the cases to determine if those results were the product of decisions made by individual policy makers.

Susan Walther has been the director of Warren County Children Services since January 2017 and was the deputy director for six months prior to becoming the director. As the director, she is the final authority on adoption assistance agreements and the renegotiation of such

agreements. (Doc. 103 at 65-66). She testified that adoption subsidies should not be limited to special needs children who have received a medical or psychological diagnosis. She also testified that adoption assistance should not be limited to expenses tied directly to the special needs of a child and, in fact, can also relate to the ordinary needs of the child for expenses such as child care, lost wages, or preschool tuition. (*Id.* at 66). Director Walther also testified that private school tuition could be an appropriate use of adoption subsidy funds. (*Id.* at 74). However, when presented with examples involving the Adoptive Families in this case, which involved at least four caseworkers and at least one supervisor who represented that such expenses were not covered, Ms. Walther testified she did not "see where it hasn't followed our policy." (*Id.* at 87).

Prospective adoptive parents are provided with numerous documents leading up to an adoption finalization. (Doc. 76, Affidavit of Tanya Sellers, Supervisor of the Adoption Unit at Warren County Children Services, ¶ 10, sections a. through u.). The Warren County Children Services Adoption Subsidy Negotiation Worksheet is the primary worksheet that families use in order to calculate the adoption subsidy they are requesting. The form includes a chart that invites the family to list the child's special condition or diagnosis and then to explain what treatment the child is receiving and the cost related to that treatment.[3] (Doc. 96 at 4, Ex. A; Doc. 76-2 at 148). The Worksheet does not include a similar chart inviting or directing families to list ordinary expenses like child care, lost wages, tuition, or cost of extracurricular activities like sports or music classes. (*Id.*). Ms. Walther testified that families can and do include such ordinary expenses under the section of the form inviting families to "[d]escribe what portion of

---

[3] The first column of the chart is for specifying the "[c]hild's special condition or diagnosis (Include any physical disability or symptoms, mental health diagnosis or symptoms, learning problems, or risk factors due to child's or bio family's history)." The remaining six columns of the chart request information about the special condition or diagnosis listed in the first column.

the cost of the child's special services or care can be covered by your family's current resources, and what portion you request to be covered by Adoption Assistance." (*Id.* at 6; Doc. 103 at 67-68). Ms. Walther testified that she spoke to her caseworkers in 2018 and understood that the caseworkers verbally explain to families the expenses that can be covered by adoption assistance, but she did not know whether this was a consistent practice or whether this had been the practice since 2012. (Doc. 103 at 69-70). Ms. Walther further admitted that the yearly letter sent to adoptive families reminding them of the right to renegotiate adoption subsidies does not give any examples of ordinary expenses that adoptive families can include in their request for a subsidy. (Doc. 103 at 87). She also stated that the adoption subsidy worksheet has not been amended to expressly state or make it more clear that ordinary expenses like lost wages, day care, preschool tuition, and other tuition are legitimate expenses for adoption subsidies. (Doc. 103 at 88). Ms. Walther testified that the circumstances for which adoption subsidies may be given are "too individualized" to put in writing for families to educate them on the types of expenses that may be considered, and it is best to verbally discuss with each individual family these items based on their individual situations. (Doc. 130 at 124-25).

When asked about the number of Warren County's "zero" subsidy cases, Ms. Walther testified that some of those cases are families who moved to Ohio from another state and who received an adoption subsidy from that state; some are families who asked for a subsidy above zero but were given a final adoption subsidy of zero; some are families who specifically requested no subsidy; and some are families that did not qualify for a subsidy because the special needs child, who is at a substantial risk of developing a developmental disability or delay, mental illness or other specified medical condition had not yet manifested symptoms, *see* Ohio Admin.

Code § 5101:2-49-03(A)(2)(h), and under State regulations[4] was entitled to a "zero" adoption subsidy. (Doc. 103 at 106-110). With respect to this last category of "zero" subsidy cases, Ms. Walther testified that the agency does not as a matter of policy assess whether such a child would also meet the separate special needs criteria set forth in Ohio Admin. Code § 5101:2-49-03(A)(2)(e): the child has been in the home of the prospective adoptive parents for at least six months and would experience severe separation and loss if placed in another setting due to significant ties with the prospective adoptive parents, as documented by a qualified mental health professional. (Doc. 103 at 130). A child who satisfies the Ohio Admin. Code § 5101:2-49-03(A)(2)(e) criteria is not limited to a zero subsidy under State regulations. Ms. Walther testified it would be "good case practice" to assess whether a child who was disqualified from a subsidy under section (A)(2)(h) may nevertheless qualify for a subsidy under (A)(2)(e). Any assessment of whether a child would meet the (A)(2)(e) special needs category occurs pre-adoption when Warren County Children Services has legal custody of the child; thus, Warren County would have to give its permission to perform or arrange for such an assessment. (*Id.* at 131-32).

## VII. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs move for class certification under Fed. R. Civ. P. 23(a) and (b)(2). They seek to represent a class consisting of "all current and potential adoptive parents and their adopted children who are eligible to receive subsidies under Title IV-E of the Adoption Assistance and Child Welfare Act who fall under the jurisdiction of Defendant Warren County, Ohio and/or Warren County Public Children's Services Association." (Doc. 105 at 1).[5] Warren County opposes the motion and argues that the named class representative plaintiffs do not have standing

---

[4] *See* Ohio Admin. Code § 5101:2-49-03(B).
[5] At oral argument, plaintiffs proposed a revised class definition, which eliminated the subclasses included in plaintiffs' initial proposed class definition.

to represent the putative class; the class representatives do not have claims that are typical of the unnamed putative class members; there is no common issue regarding adoption assistance subsidies that can be resolved by a single injunction; and there is no single remedy that the Court can fashion to provide relief to all class members under Fed. R. Civ. P. 23(b)(2).

### A. Standard for class certification.

Rule 23 governs class certification and provides:

> One or more members of a class may sue . . . as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to the four prerequisites set forth in Rule 23(a), the proposed class must satisfy at least one of the three requirements set forth in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. . . ." Fed. R. Civ. P. 23(b)(2). Plaintiffs bear the burden of satisfying the requirements for class certification under Rule 23. *In re Whirlpool Corp.*, 722 F.3d at 851 (citing *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). The trial court has broad discretion in deciding whether to certify a class, *id.*, and may certify the class if "after a rigorous analysis" it is satisfied that the prerequisites for class certification have been met. *Wal-Mart*, 564 U.S. at 350-51; *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). "A district court may delve into the merits of the plaintiffs' claims during the class

certification stage only to a limited extent." *NorCal Tea Party Patriots v. Internal Revenue Serv.*, No. 1:13-cv-341, 2016 WL 223680, at *4 (S.D. Ohio Jan. 19, 2016).

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

*In re Whirlpool*, 722 F.3d at 851 (quoting *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). *See also NorCal Tea Party*, 2016 WL 223680, at *4 ("A district court is not to treat class certification proceedings as a 'dress rehearsal for the trial on the merits.'") (quoting *In re Whirlpool*, 722 F.3d at 851-52).

### B. Analysis

#### 1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no strict numerical test for determining numerosity. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006); *In re American Med. Sys.*, 75 F.3d at 1079. *See, e.g., Smith v. Ajax Magnethermic Corp.*, No. 4:02-cv-980, 2007 WL 3355080, at *2 (N.D. Ohio Nov. 7, 2007) (certifying class of 55 former employees where damages suffered by each member were relatively small, lessening possibility of litigation of individual claims). However, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy [numerosity]." *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004). Only a "reasonable estimate or some evidence of the number of class members" is required. *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 480 (S.D. Ohio 2004).

"The reason for [the impracticability] requirement is obvious. Only when joinder is impracticable is there a need for a class action device." *In re American Med. Sys.*, 75 F.3d at

1079 (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.01, at 3-4 (3d ed. 1992)). Thus, "[t]he key to determining whether certification is appropriate under Rule 23(a)(1) rests on the impracticability of joinder." *Ledford ex rel. Epperson v. Colbert*, No. 1:10-cv-706, 2012 WL 1207211, at *3 (S.D. Ohio April 11, 2012) (citing *In re American Med. Sys.*, 75 F.3d at 1079). "Numerous factors play into the impracticability of joinder, including 'the size of the proposed class, geographic dispersion and financial resources of class members, and judicial economy.'" *Id.* (quoting *Prater v. Ohio Educ. Ass'n*, No. 2:04-cv-1077, 2008 WL 2566364, at *2 (S.D. Ohio June 26, 2008)).

There are 160 adoptive families in Warren County and the putative class is so numerous that joinder would be impracticable. Warren County has not argued that the proposed class does not meet the numerosity element. The Court therefore concludes that plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

2. Commonality

Rule 23(a)(2) mandates the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality test is qualitative rather than quantitative" in that "there need be only a single issue common to all members of the class." *In re American Med. Sys.*, 75 F.3d at 1080 (quotation omitted).

> The class-action was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class. For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23.

*Id.* (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (internal citations and quotations omitted)). Plaintiffs must show that class members have suffered the

same injury to establish the commonality requirement of Rule 23(a). *Wal-Mart*, 564 U.S. at 350. "Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit." *In re Whirlpool Corp.*, 722 F.3d at 852 (citing *Wal-Mart*, 564 U.S. at 350).

There are questions of fact and law common to all of the proposed class members. Warren County has alleged a common defense in this case: that plaintiffs do not have an enforceable right to adoption assistance payments under 42 U.S.C. § 673 because "[p]ayment of the subsidy is within the discretion of the State administering Title IV-E funds." (Doc. 15 at 3). Warren County contends that states have the discretion "in determining when and in what amounts to provide adoption assistance subsidies." (Doc. 15 at 1). Whether adoptive families have an enforceable right to adoption assistance subsidies under the federal statute is a question shared by all adoptive families in Warren County.[6]

In addition, plaintiffs have presented evidence showing that Warren County is a statistically significant outlier when it comes to the mean amount of adoption assistance granted to adoptive families and the number of adoptive families awarded a "zero" subsidy. The circumstances and experiences of Adoptive Families #1 through #6 which they testified about or included in their sworn declarations, when coupled with the statistically relevant information presented by Dr. Calfano, are sufficient to show there are common questions of fact and law shared by the putative class as to:

- Whether Warren County denies adoption assistance subsidies in the absence of a diagnosis of a particular medical need.

---

[6] This Court has previously resolved this question in the affirmative. (Doc. 40).

- Whether Warren County denies adoption assistance subsidies in the absence of a need directly tied to the special needs of the adopted child.

- Whether Warren County denies adoption assistance subsidies for ordinary needs and expenses such as day care, tuition, and lost wages.

- Whether Warren County categorizes children as Title IV-E eligible based on a substantial risk of developing a medical or psychological need based on the biological family history that has not yet manifested – resulting in a zero subsidy – without examining whether children may be categorized as special needs based on another statutory factor, namely whether the child has been in the home of the prospective adoptive parents for at least six months and would experience severe separation and loss if placed in another setting due to significant ties with the prospective adoptive parents, as documented by a qualified mental health professional.

Warren County contends that the circumstances of each adoptive family are unique, the determination of adoption assistance subsidies is a highly individualized process, and there is no commonality among adoptive families in determining adoption assistance subsidies.[7] Warren County points to the evidence showing that there are a variety of reasons for a "zero" adoption assistance subsidy, and plaintiffs' expert admitted he did not know the specific reasons underlying any of the particular zero amounts but nevertheless opined that the statistical analysis he performed suggested they resulted from the systematic effects of policy decisions. Warren County also points to certain inconsistencies between the deposition testimony and declarations

---

[7] *Ah Chong v. McManaman*, No. CV 13-00663, 2015 WL 13554008 (D. Haw. Aug. 17, 2015), cited by Warren County, is distinguishable. In *Ah Chong*, the plaintiffs sought a declaratory judgment and injunctive relief on the ground that foster care maintenance payments and adoption assistance payments were inadequate under Title IV-E. The plaintiffs proposed two subclasses: a foster care payment subclass and adoption assistance payment subclass. Under Title IV-E, adoption assistance payments are capped at the amount of foster care maintenance payments. The State of Hawaii, as a matter of policy, always paid the maximum amount of adoption assistance possible under the statute to eliminate any financial disincentive to adopting a child with special needs. 2015 WL 13554008, at *12. The court certified the foster care subclass as "the class" but declined to certify a separate adoption assistance payment subclass. The court determined that the factual and legal issues regarding the amount of adoption assistance payments would necessarily be litigated by the foster care subclass and there were no issues of fact or law "unique to the Adoption Assistance Subclass and common to the members of that subclass." *Id.* Here, in contrast, adoption assistance subsidies are not tied to foster care payments and plaintiffs have identified common issues of fact and law that are capable of class-wide resolution.

of the Adoptive Families and to the affidavit of Tanya Sellers in arguing there is no set formula for determining adoption assistance subsidies and Warren County's practices are consistent with federal law.

Warren County's arguments relate to the merits of the underlying case as to whether Warren County has a policy or practice that limits adoption assistance subsidies in a way that violates federal law. The Court's task is not to resolve the merits of plaintiffs' claims or Warren County's defenses at this juncture but to assess whether plaintiffs have raised common questions of fact or law that meet the Rule 23 requirements for class action certification. *In re Whirlpool*, 722 F.3d at 851-52. While the specific amount of the adoption assistance subsidy may vary from family to family, the factual issues concerning the policies and practices Warren County follows in setting adoption subsidies, the criteria used (i.e., whether a child has a "diagnosis"), and the types of expenses it will consider in the adoption subsidy process will be the same for each class member. Resolution of plaintiffs' claims will advance the litigation as a whole and affect each member of the class. The common questions of fact and law outlined above meet the requirements of Rule 23(a)(2). Therefore, the Court finds the commonality requirement is satisfied.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re American Med. Sys.*, 75 F.3d at 1082 (quoting 1 *Newberg, supra*, § 3-13, at 3-76 (footnote omitted)). The typicality prerequisite "determines whether a sufficient relationship exists between the injury to

the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Id*. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (holding that typicality is not established where resolution of a named plaintiff's claim would not "necessarily have proved anybody else's claim.").

Warren County argues that class certification is inappropriate because the named plaintiffs' claims are atypical of the putative class members. First, Warren County asserts that the named plaintiffs lack standing to pursue the class claims for declaratory and injunctive relief. (Doc. 77 at 4-9). Second, Warren County argues that the named plaintiffs' claims are not typical of the proposed class. (Doc. 77 at 9-11).

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Senter v. General Motors Corp.*, 532 F.2d 511, 516 (6th Cir. 1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "In its constitutional dimension, standing imports justiciability . . . [where] the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III." *Id*. at 516-17; *see also United States v. Van*, 931 F.2d. 384 (6th Cir. 1991). A "case or controversy" is a personal stake in the outcome. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). To establish standing, a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendant's conduct; and (3) a federal court decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In determining standing, "the relevant inquiry is whether [the plaintiff] had a live, actionable claim for relief at the time [the plaintiff] filed suit. *Williams v. City of Cleveland*, 907 F.3d 924, 933 (6th Cir. 2018) (citing *Sumpter v.*

*Wayne Cty.*, 868 F.3d 473, 491 (6th Cir. 2017); *Smith v. Jefferson County Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011) ("Standing to bring suit must be determined at the time the complaint is filed."). Where, as here, injunctive or declaratory relief is sought, the plaintiff must show he or she is "subject to an actual present harm or a significant possibility of future harm." *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 833 (6th Cir. 2001) (internal quotation omitted). While a prior injury does not confer standing to seek injunctive or declaratory relief, it does constitute "'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Id.* at 833 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Only one named plaintiff is required to establish standing to seek relief on behalf of the class. *See Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998).

There is no question that all three named Adoptive Families had "a live, actionable claim for injunctive relief at the time [they] filed suit." *Sumpter*, 868 F.3d at 491. At the time of the filing of the amended complaint, none of the Adoptive Families had renegotiated their adoption assistance subsidy agreements. In addition, all of the named Adoptive Families were subject to the policies and practices challenged in this case at the time their original adoption assistance subsidies were determined.

Even if Adoptive Families #1 and #2 lack standing at this point by virtue of renegotiating their adoption assistance subsidies with Warren County, Adoptive Family #3 has not renegotiated its adoption assistance subsidy. Adoptive Family #3 confronts the same circumstances it did when the lawsuit was filed and when the amended complaint was filed. Warren County contends that Adoptive Family #3 has "disengaged" from the renegotiation process and therefore has no injury that entitles it to claim standing. Essentially, Warren County is alleging that Adoptive Family #3 must exhaust its State administrative remedies, an argument

this Court has previously rejected. (*See* Doc. 26 at 23-25; Doc. 40). Nor has Warren County cited any legal authority for the proposition that voluntarily disengaging from the renegotiation process under the circumstances presented results in a lack of standing. More importantly, all of the named plaintiffs have standing because they have been and will be subject to the same policies and practices for determining adoption assistance subsidies in any future renegotiations with Warren County. A family can seek to renegotiate an adoption subsidy "at any time," and therefore the named Adoptive Families will be subject to the same policies and practices they challenge in this lawsuit. This is not a "one and done" process as Adoptive Families are invited to renegotiate their adoption assistance subsidies on at least a once yearly basis. All of the named Adoptive Families have an ongoing relationship with Warren County by virtue of their adoption assistance agreements and have standing to challenge the policies and practices at issue in this case.[8]

Warren County also argues that the claims of the named class representatives are not typical of the putative class because Adoptive Families #1 and #2 have renegotiated their adoption subsidies for amounts that meet or exceed the amounts they were receiving for foster care maintenance payments, and Adoptive Family #3 has "voluntarily disengaged from the adoption assistance process." (Doc. 77 at 10). Warren County essentially reiterates the same arguments it made regarding standing, which for the reasons discussed above do not render the claims of the named Adoptive Families #1 through #3 atypical of the putative class. Plaintiffs

---

[8] Even if Warren County argued that the claim for class-wide injunctive relief was rendered moot by the renegotiations of Adoptive Families #1 and #2, which Warren County does not (Doc. 103 at 24-25), the inherently transitory exception to mootness would apply in this case. This exception applies here because the injury is "so transitory that it would likely evade review by becoming moot before the district court can rule on class certification," and it is clear that "other class members are suffering the injury." *Unan v. Lyon*, 853 F.3d 279, 287 (6th Cir. 2017) (citation omitted). Whether a claim is inherently transitory does not depend merely on how long a claim is likely to remain active, but also on the uncertainty about the length of time a claim will remain alive as this case aptly illustrates. *Id.*

challenge the process used by Warren County in negotiating adoption assistance subsidies and will be subjected to the very same process at each renegotiation of such subsidies. The named plaintiffs' interests are aligned with those of the putative class, and the injunctive and declaratory relief sought will inure to the benefit of all class members. The Court concludes plaintiffs have established that the proposed class meets the typicality requirement of Rule 23(a)(3).

### 4. Adequacy of Representation

Under Rule 23(a)(4), plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Sixth Circuit has "articulated two criteria for determining adequacy of representation: '1) the representative[s] must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re American Med. Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.* In addition, in assessing the adequacy of class representation, the Court considers "whether class counsel are qualified, experienced and generally able to conduct the litigation" and "whether the class members have interests that are not antagonistic to one another." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (citation omitted).

For the reasons discussed above in connection with Rule 23(a)(3)'s typicality requirement, the named plaintiffs' interests are coextensive with those of the class. The named plaintiffs challenge Warren County's policies and practices in determining adoption assistance subsidies that apply to all adoptive families and there is no indication that the interests of

Adoptive Families #1, #2, and #3 are antagonistic to those of the putative class members. The Court concludes that plaintiffs will fairly and adequately protect the interests of the class. With regard to the qualifications of counsel, plaintiffs allege their counsel is qualified, experienced and able to conduct the instant litigation, and Warren County does not argue that plaintiffs' counsel is unqualified. Based on plaintiffs' representations and Warren County's lack of opposition, the Court finds the final Rule 23(a) requirement is met.

### 5. Rule 23(b)(2) Criteria

In addition to satisfying the criteria of Rule 23(a), plaintiffs must also demonstrate that their proposed class meets one of the requirements of Fed. R. Civ. P. 23(b). *See Wal-Mart*, 564 U.S. at 345; *In re Whirlpool Corp.*, 722 F.3d at 850. Plaintiffs rely on Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The "key to the [Rule 23](b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

This matter is appropriate for class certification under Rule 23(b)(2). All members of the class are affected by the policies and practices of Warren County that are challenged in this case.

Warren County contends that while there may have been discrete circumstances in the past where agency employees may have made representations to adoptive parents that did not reflect agency policy, there is no evidence of a present agency policy that violates Title IV-E that must be enjoined. (Doc. 77 at 15). However, Director Walther testified that the amount of adoption assistance subsidies has been very consistent over the years; she denied that the circumstances described by the named plaintiffs were contrary to Warren County's policy; and she testified that there has been no retraining of caseworkers or notice to families identifying possible past issues in need of remedial action, strongly suggesting there has been no change in past or current policy or practice. (Doc. 103 at 69, 87, 88, 121, 123). Plaintiffs also seek injunctive relief enjoining Warren County from continuing its practices of denying adoption assistance to eligible families and ordering Warren County to make such assistance available to plaintiffs. This would include providing adoptive families with notice of and access to a process that would remedy any violations of Title IV-E adoption assistance and training of its employees on their legal obligations, on children's eligibility, and on the proper factors to consider in negotiating adoption assistance payments. Contrary to Warren County's argument, the relief plaintiffs seek would not require a different injunction based on the unique needs of a particular adoptive family. Additionally, plaintiffs seek a declaratory judgment that Warren County is violating its obligations under Title IV-E and the United States Constitution. The requested declaratory and injunctive relief will apply uniformly to all class members, regardless of the unique situation of any individual plaintiff, and a single injunction that requires Warren County to follow established, uniform procedures and criteria in negotiating adoption assistance subsidies would provide relief to all class members across the board. Accordingly, plaintiffs' proposed class is appropriate for certification under Rule 23(b)(2).

25

## IT IS THEREFORE RECOMMENDED THAT:

1. Plaintiffs' motion to certify the class be GRANTED.

2. This case be maintained as a class action on behalf of the following class of plaintiffs:

> All current and potential adoptive parents and their adopted children who are eligible to receive subsidies under Title IV-E of the Adoption Assistance and Child Welfare Act who fall under the jurisdiction of Defendant Warren County, Ohio and/or Warren County Public Children's Services Association.

3. Adoptive Family #1, Adoptive Family #2, and Adoptive Family #3 be designated as class representatives and Alphonse Gerhardstein, Jennifer Branch, M. Caroline Hyatt, and Barbara Thornhill Ginn be designated to serve as class counsel.

Date: 2/28/19

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ADOPTIVE FAMILY #1 AND THEIR
DAUGHTER A, et al.,
      Plaintiffs,

Case No. 1:18-cv-179
Dlott, J.
Litkovitz, M.J.

vs.

WARREN COUNTY, OHIO/WARREN
COUNTY BOARD OF
COMMISSIONERS,
      Defendant.

**REPORT AND
RECOMMENDATION**

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).